## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| Brent Wulf, Eugen Radulescu, Bingpei Guo, David Bryan Wessinger, Robert Casteel, Jack Higbee, Jr., Michael Kuznetz, Atul Ratanji, Rodney Gainous, Shana Taylor, Terrance Martin, Shaun Hodge, Brandi Marie Garza, Merardo Guerra, David Zolyak, | : : : : : : : : |
| Plaintiffs, | : : Civil Case No.: 4:19-cv-46 |
| vs. | : : |
| BMW of North America, LLC, | : : |
| Defendant. | : : : : |

### FIRST AMENDED COMPLAINT

For this First Amended Complaint, the Plaintiffs Brent Wulf, Eugen Radulescu, Bingpei Guo, David Bryan Wessinger, Robert Casteel, Jack Higbee, Jr., Michael Kuznetz, Atul Ratanji, Rodney Gainous, Shana Taylor, Terrance Martin, Shaun Hodge, Brandi Marie Garza, Merardo Guerra, David Zolyak, by undersigned counsel, state as follows:

### PRELIMINARY STATEMENT

1.      This is a group action by the purchasers of vehicles (hereafter the "subject vehicles") manufactured and sold by the Defendant BMW of North America, LLC and Bavarian Motor Works.  Plaintiffs seek damages related to their vehicles' faulty engines that suffer from excessive consumption of engine oil and Defendant's failure to honor the terms of its warranty.

2.      The Plaintiffs would not have purchased the subject vehicles had they been made aware of the subject vehicles' defective engines.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter pursuant to the

Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1)(B), in that the Plaintiffs claim more

than $50,000.00 in damages, exclusive of interest and costs, and under the doctrine of

supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

4.      In addition, this Court has subject matter jurisdiction over this matter pursuant

to 28 U.S.C. § 1332(a) in that there is complete diversity of citizenship between the parties

and the amount in controversy exceeds $75,000.00.

5.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) in that

a substantial part of the events giving rise to the Plaintiffs' claims occurred within this

District; this District is where Defendant directs and controls warranty repairs on covered

vehicles and this District is where Defendant made repeated misrepresentations to Plaintiffs

and where Defendant concealed certain material information from Plaintiffs.

## PARTIES

6.      Plaintiffs were, at all relevant times, adult individuals who either reside in

Texas and/or who purchased motor vehicles in Texas which were manufactured or sold by

Defendant.

7.      Defendant BMW of North America, LLC ("BMW-NA" or "BMW") is

organized under the laws of Delaware with its principal place of business located at 300

Chestnut Ridge Road, Woodcliff, New Jersey. BMW-NA was created in 1975 to act as the

United States importer of BMW luxury and performance vehicles, which were traditionally

manufactured in Munich, Germany.  At all relevant times, BMW was engaged in the business

2

of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of Texas and throughout the United States.

8.     BMW-NA sells BMW vehicles through a network of independently owned dealerships across the United States that are agents of BMW-NA.

## FACTUAL ALLEGATIONS APPLICABLE TO INDIVIDUAL PLAINTIFFS

**I.   Brent Wulf**

9.     Plaintiff Brent Wulf (hereafter "B. Wulf") is an adult individual residing in The Woodlands, Texas.

10.     On or about January 19, 2013, B. Wulf purchased a used 2011 BMW 7 Series 750Li, Vehicle Identification Number WBAKB8C55BCY66381 (hereafter the "B. Wulf Vehicle") from BMW of Houston North, an authorized dealer of the Defendant.

11.     The total sales price for the B. Wulf Vehicle was $69,406.45.

12.     Soon after purchasing the B. Wulf Vehicle, B. Wulf observed that it consumed an excessive amount of engine oil which required him to add as much as one quart of oil every 1,000 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

13.     B. Wulf notified BMW of Houston North and BMW of the Woodlands, both of which are authorized dealerships of the Defendant, on numerous occasions throughout the warranty period that the B. Wulf Vehicle consumed an excessive amount of engine oil.

14.     In response, B. Wulf was consistently told by the dealers that the B. Wulf's excessive engine oil consumption "is just the way it is," and accordingly, B. Wulf was told the B. Wulf Vehicle's consumption of engine oil did not warrant any repairs.

15.     As a result of the B. Wulf Vehicle's excessive consumption of engine oil, B. Wulf had to add engine oil to the B. Wulf Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

16.     In total, B. Wulf paid approximately $4,800 in out-of-pocket costs and repairs associated with the B. Wulf's excessive engine oil consumption .

**II.     Eugen Radulescu**

17.     Plaintiff Eugen Radulescu (hereafter "E. Radulescu") is an adult individual residing in Bellaire, Texas.

18.     On or about January 25, 2013, E. Radulescu purchased a new 2013 BMW 5 Series 550i, Vehicle Identification Number WBAFR9C54DDX81077 (hereafter the "E. Radulescu Vehicle") from Momentum BMW, an authorized dealer of the Defendant.

19.     The total sales price for the E. Radulescu Vehicle was $59,550.94.

20.     Soon after purchasing the E. Radulescu Vehicle, E. Radulescu observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every month or every 600 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

21.     E. Radulescu notified Momentum BMW and Advantage BMW, both of which are authorized dealerships of the Defendant, on numerous occasions throughout the warranty period that the E. Radulescu Vehicle consumed an excessive amount of engine oil.

22.     In response, E. Radulescu was told by the dealerships that the E. Radulescu Vehicle's excessive engine oil consumption "is normal" and "all engines burn oil," and accordingly, E. Radulescu was told the Vehicle's consumption of engine oil did not warrant any repairs.

4

23.     As a result of the E. Radulescu Vehicle's excessive consumption of engine oil, E. Radulescu had to add engine oil to the E. Radulescu Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

24.     In total, E. Radulescu paid approximately $1,500 in out-of-pocket costs and repairs associated with the E. Radulescu Vehicle's excessive engine oil consumption.

**III.    Bingpei Guo**

25.     Plaintiff Bingpei Guo (hereafter "B. Guo") is an adult individual residing in Sugarland, Texas.

26.     On or about September 11, 2010, B. Guo purchased a new 2011 BMW 750li, Vehicle Identification Number WBAKB8C57BCY66091 (hereafter the "B. Guo Vehicle") from Momentum BMW, an authorized dealer of the Defendant.

27.     The total sales price for the B. Guo Vehicle was $107,700.

28.     Soon after purchasing the B. Guo Vehicle, B. Guo observed that it consumed an excessive amount of engine oil which required him to add two to three quarts of oil every 2,000 to 3,000 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

29.     B. Guo notified Momentum BMW, an authorized dealer of the Defendant, on numerous occasions throughout the warranty period that the B. Guo Vehicle consumed an excessive amount of engine oil.

30.     In response, the dealer did not offer any repairs or solution for the oil consumption issue.

31.     As a result of the B. Guo Vehicle's excessive consumption of engine oil, B. Guo had to add engine oil to the B. Guo Vehicle in between the Defendant's recommended oil

change intervals in order to prevent the vehicle's engine from failing.

## IV.     David Bryan Wessinger

32.     Plaintiff David Bryan Wessinger (hereafter "D. Wessinger") is an adult individual residing in Spring, Texas.

33.     On or about June 4, 2016, D. Wessinger purchased a certified pre-owned 2013 BMW X5 XDrive 50i, Vehicle Identification Number 5UXZV8C54DL426405 (hereafter the "D. Wessinger Vehicle") from BMW of The Woodlands, an authorized dealer of the Defendant.

34.     The total sales price for the D. Wessinger Vehicle was $43,437.25.

35.     Soon after purchasing the D. Wessinger Vehicle, D. Wessinger observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 300 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

36.     D. Wessinger notified BMW of Woodlands, an authorized dealership of the Defendant, on numerous occasions throughout the warranty period that the D. Wessinger Vehicle consumed an excessive amount of engine oil.

37.     In response, D. Wessinger was told that oil burn/consumption "is very common with turbos," and accordingly, D. Wessinger was told the D. Wessinger Vehicle's consumption of engine oil did not warrant any repairs.

38.     As a result of the D. Wessinger Vehicle's excessive consumption of engine oil, D. Wessinger had to add engine oil to the D. Wessinger Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

39.     In total, D. Wessinger paid approximately $4,500 in out-of-pocket costs and repairs associated with the D. Wessinger Vehicle's excessive engine oil consumption.

**V.   Robert Casteel**

40.     Plaintiff Robert Casteel (hereafter "R. Casteel") is an adult individual residing in Houston, Texas.

41.     On or about October 23, 2014, R. Casteel purchased a used 2011 BMW 7 Series 750Li, Vehicle Identification Number WBAKB8C5XBCY65808 (hereafter the "R. Casteel Vehicle") from BMW of Houston North, an authorized dealer of Defendant.

42.     The total sales price for the R. Casteel Vehicle was $36,882.

43.     Within several months after purchasing the R. Casteel Vehicle, R. Casteel observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 1,500 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

44.     R. Casteel notified BMW of Houston, an authorized dealer of the Defendant, on numerous occasions throughout the warranty period that the R. Casteel Vehicle consumed an excessive amount of engine oil.

45.     In October 2016, R. Casteel again complained to the Defendant's authorized dealer that he was having to top off engine oil every few weeks.  In response, the Defendant's authorized dealer replaced all gaskets, o-rings and crush rings on the R. Casteel Vehicle, as well as made other repairs.

46.     Despite the repairs, the R. Casteel Vehicle continued to burn an excessive amount of oil.

47.     As a result of the R. Casteel Vehicle's excessive consumption of engine oil, R. Casteel had to add engine oil to the R. Casteel Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

48.     In total, R. Casteel paid approximately $3,650 in out-of-pocket costs and repairs associated with the R. Casteel Vehicle's excessive engine oil consumption.

**VI.     Jack Higbee, Jr.**

49.     Plaintiff Jack Higbee, Jr. (hereafter "J. Higbee") is an adult individual residing in Humble, Texas.

50.     On or about  December 19, 2015, J. Higbee purchased a certified pre-owned 2014  BMW X5 XDrive 50i, Vehicle Identification Number 5UXKR6C58E0J73697 (hereafter the "J. Higbee Vehicle") from Winslow BMW of Colorado Springs, an authorized dealer of Defendant.

51.     The total sales price for the J. Higbee Vehicle was $67,000.

52.     After purchasing the J. Higbee Vehicle, J. Higbee observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 1,000 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

53.     J. Higbee notified BMW of Houston, an authorized dealer of the Defendant, in September 2017 and during the warranty period that the J. Higbee Vehicle consumed an excessive amount of engine oil.

54.     In response, the Defendant's authorized dealer performed an oil consumption test on the J. Higbee Vehicle which revealed that it was necessary to add engine oil ever 1,000 miles.  The Defendant's authorized dealer explained that no repairs were necessary and stated

the oil consumption was normal and within normal range for the vehicle's turbocharged V8 engine.

56.     As a result of the J. Higbee Vehicle's excessive consumption of engine oil, J. Higbee had to add engine oil to the J. Higbee Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

**VII.    Michael Kuznetz**

56.     Plaintiff Michael Kuznetz (hereafter "M. Kuznetz") is an adult individual residing in Houston, Texas.

57.     On or about March 29, 2014, M. Kuznetz purchased a used 2012 BMW X6 XDrive 50i, Vehicle Identification Number 5UXFG8C59CLZ97397 (hereafter the "M. Kuznetz Vehicle") from Momentum BMW, an authorized dealer of Defendant.

58.     The total sales price for the M. Kuznetz Vehicle was $58,000.

59.     Soon after purchasing the M. Kuznetz Vehicle, M. Kuznetz observed that it consumed an excessive amount of engine oil which required him to add one to two quarts of oil every 1,500 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

60.     M. Kuznetz notified Momentum BMW, an authorized dealer of the Defendant, during the warranty period that the M. Kuznetz Vehicle consumed an excessive amount of engine oil.

61.     In response, the dealer told M. Kuznetz "that's what these cars do," and consequently no repairs were offered to resolve the oil burn issue.

62.     As a result of the M. Kuznetz Vehicle's excessive consumption of engine oil, M. Kuznetz had to add engine oil to the M. Kuznetz Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

63.     M. Kuznetz has paid approximately $2,500 in out-of-pocket costs and repairs associated with the M. Kuznetz Vehicle's excessive engine oil consumption.

## VIII.    Atul Ratanji

64.     Plaintiff Atul Ratanji (hereafter "A. Ratanji") is an adult individual residing in Bryan, Texas.

65.     On or about January 19, 2013, A. Ratanji purchased a new 2013  BMW 7 Series 750Li, Vehicle Identification Number WBAYE8C50DD132486 (hereafter the "A. Ratanji Vehicle") from BMW Mini of Arlington, an authorized dealer of Defendant.

66.     The total sales price for the A. Ratanji Vehicle was $107,631.

67.     Soon after purchasing the A. Ratanji Vehicle, A. Ratanji observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 2,500 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

68.     A. Ratanji notified BMW of Brazos Valley, an authorized dealer of the Defendant, during the warranty period that the A. Ratanji Vehicle consumed an excessive amount of engine oil.

69.     In response, the dealer told A. Ratanji that such oil consumption was normal "for this model vehicle," and accordingly offered no repairs.  The dealer did however provide A. Ratanji with extra oil to carry in the A. Ratanji Vehicle due to its excessive oil consumption.

70.     As a result of the A. Ratanji Vehicle's excessive consumption of engine oil, A. Ratanji had to add engine oil to the A. Ratanji Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

## IX.     Rodney Gainous

71.     Plaintiff Rodney Gainous (hereafter "R. Gainous") is an adult individual residing in Humble, Texas.

72.     On or about November 11, 2017, R. Gainous purchased a used 2014 BMW 550i, Vehicle Identification Number WBAKN9C58ED681978 (hereafter the "R. Gainous Vehicle") from Epic Auto Sales.

73.     The total sales price for the R. Gainous Vehicle was $56,013.76.

74.     In December 2017, R. Gainous presented his vehicle to BMW of Houston North, an authorized dealership of the Defendant, on two occasions and complained about a burning smell emanating from the engine and that the car was was running "rough."  In response the dealer performed repairs on the vehicle, including replacing the vehicle's engine.

75.     However, despite the new engine, R. Gainous observed that the R. Gainous Vehicle consumed an excessive amount of engine oil which required R. Gainous to add two quarts of engine oil every 2,000 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

76.     R. Gainous complained to BMW of Houston North regarding the oil consumption issue and was told that such oil consumption didn't surprise them and the dealer confirmed that such vehicles "do burn oil."

77.     The authorized dealer of the Defendant found no leaks and offered no repairs for the excessive oil consumption.

78.    As a result of the R. Gainous Vehicle's excessive consumption of engine oil, R. Gainous had to add engine oil to the R. Gainous Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

**X.    Shana Taylor**

79.    Plaintiff Shana Taylor (hereafter "S. Taylor") is an adult individual residing in Madisonville, Texas.

80.    On or about June 8, 2017, S. Taylor purchased a certified pre-owned 2014 BMW 7 Series 750Li, Vehicle Identification Number WBAYE8C57ED135712 (hereafter the "S. Taylor Vehicle") from BMW of Houston North, an authorized dealer of Defendant.

81.    The total sales price for the S. Taylor Vehicle was $44,981.

82.    Soon after purchasing the S. Taylor Vehicle, S. Taylor observed that it consumed an excessive amount of engine oil which required her to add two quarts of oil every 3,000 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

83.    S. Taylor notified BMW of the Woodland, an authorized dealership of the Defendant, during the warranty period that the S. Taylor Vehicle consumed an excessive amount of engine oil.

84.    In response, the dealer told S. Taylor that such oil consumption was normal and, accordingly offered no repairs.

85.    As a result of the S. Taylor Vehicle's excessive consumption of engine oil, S. Taylor had to add engine oil to the S. Taylor Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

## XI.    Terrance Martin

86.    Plaintiff Terrance Martin (hereafter "T. Martin") is an adult individual residing in Friendswood, Texas.

87.    On or about October 12, 2012, T. Martin purchased a new 2013 BMW 5 Series 550i, Vehicle Identification Number WBAFR9C58DDX79994 (hereafter the "T. Martin Vehicle") from BMW of Austin, an authorized dealer of Defendant.

88.    The total sales price for the T. Martin Vehicle was $79,626.34.

89.    Soon after purchasing the T. Martin Vehicle, T. Martin observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 350 to 400 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

90.    T. Martin notified Advantage BMW of Clear Lake and Advantage BMW of Midtown, both authorized dealerships of the Defendant, during the warranty period that the T. Martin Vehicle consumed an excessive amount of engine oil.

91.    In response, the dealer told T. Martin "this type of engine uses a lot of oil," and consequently no repairs were offered to resolve the oil burn issue.

92.    As a result of the T. Martin Vehicle's excessive consumption of engine oil, T. Martin had to add engine oil to the T. Martin Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

93.    In total, T. Martin paid approximately $19,900 in out-of-pocket costs and repairs associated with the T. Martin Vehicle's excessive engine oil consumption.

XII.    **Shaun Hodge**

94.     Plaintiff Shaun Hodge (hereafter "S. Hodge") is an adult individual residing in League City, Texas.

95.     On or about December 26, 2012, S. Hodge purchased a new 2013 BMW 550i, Vehicle Identification Number WBAFR9C59DDX80426 (hereafter the "S. Hodge Vehicle") from Advantage BMW of Clear Lake, an authorized dealer of Defendant.

96.     The total sales price for the S. Hodge Vehicle was approximately $72,500.

97.     Soon after purchasing the S. Hodge Vehicle, S. Hodge observed that it consumed an excessive amount of engine oil which required him to add five quarts of oil every 4,000 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

98.     S. Hodge notified Advantage BMW of Clear Lake, an authorized dealership of the Defendant, during the warranty period that the S. Hodge Vehicle consumed an excessive amount of engine oil.

99.     In response, Defendant's authorized dealer told S. Hodge that the oil consumption was normal for the type of engine with which his vehicle was equipped.  The dealer did not offer any repairs to resolve the vehicle's excessive oil consumption.

100.    As a result of the S. Hodge Vehicle's excessive consumption of engine oil, S. Hodge had to add engine oil to the S. Hodge Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

101.    In total, S. Hodge has paid approximately $2,900 in out-of-pocket costs associated with the S. Hodge Vehicle's excessive engine oil consumption.

14

## XIII.    Brandi Marie Garza

102.    Plaintiff Brandi Marie Garza (hereafter "B. Garza") is an adult individual residing in McAllen, Texas.

103.    On or about October 14, 2017, B. Garza purchased a used 2013 BMW 550i, Vehicle Identification Number WBAFR9C50DDX80024 (hereafter the "B. Garza Vehicle") from Bert Ogden BMW, an authorized dealer of Defendant.

104.    The total sales price for the B. Garza Vehicle was $38,198.

105.    Immediately after purchasing the B. Garza Vehicle, B. Garza observed that it consumed an excessive amount of engine oil which required her to add one quart of oil every 700 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

106.    B. Garza notified Bert Ogden BMW, an authorized dealership of the Defendant, during the warranty period that the B. Garza Vehicle consumed an excessive amount of engine oil.

107.    In response, Defendant's authorized dealer told B. Garza that the oil consumption was normal and instructed B. Garza to just add more oil.  Accordingly, the dealer did not offer any repairs to resolve the vehicle's excessive oil consumption.

108.    As a result of the B. Garza Vehicle's excessive consumption of engine oil, B. Garza had to add engine oil to the B. Garza Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

109.    In total, B. Garza paid approximately $710 in out-of-pocket costs and repairs associated with the B. Garza Vehicle's excessive engine oil consumption.

### XIV.    Merardo Guerra

110.    Plaintiff Merardo Guerra (hereafter "M. Guerra") is an adult individual residing in Pharr, Texas.

111.    On or about August 28, 2014, M. Guerra purchased a used 2010 BMW 7 Series 750i, Vehicle Identification Number WBAKA8C52ACY35980 (hereafter the "M. Guerra Vehicle") from Texas Direct Auto.

112.    The total sales price for the M. Guerra Vehicle was $36,284.49.

113.    Soon after purchasing the M. Guerra Vehicle, M. Guerra observed that it consumed an excessive amount of engine oil which required him to add one quart of oil every 1,500 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

114.    M. Guerra notified Bert Ogden BMW, an authorized dealer of the Defendant, during the warranty period that the M. Guerra Vehicle consumed an excessive amount of engine oil.

115.    In response, Defendant's authorized dealer told M. Guerra that the oil consumption was normal because the M. Guerra Vehicle's turbos require a lot of oil. Accordingly, the dealer did not offer any repairs to resolve the vehicle's excessive oil consumption.

116.    As a result of the M. Guerra Vehicle's excessive consumption of engine oil, M. Guerra had to add engine oil to the M. Guerra Vehicle in between the Defendant's recommended oil change intervals in order to prevent the vehicle's engine from failing.

117.    In total, M. Guerra has paid approximately $1,060 in out-of-pocket costs and repairs associated with the M. Guerra Vehicle's excessive engine oil consumption.

## XV.    David Zolyak

118.    Plaintiff David Zolyak (hereafter "D. Zolyak") is an adult individual residing in Seabrook, Texas.

119.    On or about February 13, 2012, D. Zolyak purchased a used 2011 BMW 550i, Vehicle Identification Number WBAFR9C50BC758138 (hereafter the "D. Zolyak Vehicle") from Advantage BMW MINI of Clear Lake in League City, Texas, an authorized dealer of the Defendant.

120.    The total sales price for the D. Zolyak Vehicle was $65,482.

121.    After purchasing the D. Zolyak Vehicle, D. Zolyak observed that it consumed an excessive amount of engine oil which required him to add a quart of oil every 500 to 2,500 miles throughout the warranty period and well before the Defendant's recommended oil change intervals.

122.    D. Zolyak notified Advantage BMW in Houston, Texas, BMW of Monrovia, Advantage BMW of Clear Lake and Kelly BMW, all authorized dealerships of the Defendant, during the warranty period that the D. Zolyak Vehicle consumed an excessive amount of engine oil.

123.    Despite numerous complaints and numerous repair attempts by the Defendant's authorized dealerships, the dealerships were unable to repair the D. Zolyak Vehicle and it continued to consume an excessive amount of engine oil.

124.    As a result of the D. Zolyak Vehicle's excessive consumption of engine oil D. Zolyak had to add engine oil to the D. Zolyak Vehicle in between the Defendant's recommended oil change intervals in an effort to prevent the vehicle's engine from failing.

125.     In total, D. Zolyak paid approximately $4,500 in out-of-pocket costs and repairs associated with the D. Zolyak Vehicle's excessive engine oil consumption.

**FACTUAL ALLEGATIONS APPLICABLE TO ALL PLAINTIFFS**

126.     Defendant manufactured and placed into the stream of commerce each of the aforementioned vehicles (the subject vehicles), which the Plaintiffs subsequently purchased.

127.     At the time Plaintiffs purchased the subject vehicles, Defendant made representations as to the subject vehicles' performance and quality and assured the Plaintiffs that the subject vehicles were free from defects of workmanship.

128.     Prior to purchasing their vehicles, all Plaintiffs relied upon Defendant's representations regarding Defendant's New Vehicle Limited Warranty that accompanied the sale of their vehicles, including the representation that Defendant would repair their vehicles' engines; these representations were material to Plaintiffs' decision to purchase their vehicles.

129.     Specifically, under its New Vehicle Limited Warranty, Defendant promised to repair or replace components found to be defective in material or workmanship during the 4-year / 50,000-mile following such vehicle delivery to consumer.

130.     Defendant's authorized dealers expressly assented to perform warranty repairs on the subject vehicles, necessary to bring Defendant in compliance with the Defendant's express warranty.

131.     Defendant controls the execution of all warranty repairs by its dealers, as it provides training, materials, special tools, diagnostic software, and replacement parts to its dealers, and demands that the warranty repairs be performed in strict accordance with its repair guidelines, Technical Service Bulletins, and other instructions.

132.   In return, Defendant pays its authorized dealerships monetary compensation for such warranty repairs.

133.   Therefore, Defendant's authorized dealers are agents for purpose of vehicle repairs, and knowledge of a defect reported to any such dealer can be imputed to Defendant.

134.   After purchasing their vehicles, Plaintiffs discovered that, unbeknownst to them, the subject vehicles' engines contain a manufacturing defect which causes each of the subject vehicles to consume engine oil at an extremely rapid rate.

135.   Moreover, Plaintiffs discovered that as a result of the subject vehicles' above-described defect, Plaintiffs were required to regularly add additional engine oil to their vehicles in between the Defendant's recommended oil change intervals in order to prevent their vehicles' engines from failing and suffering from other related damage.

136.   In 2008, BMW introduced a new V8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63."  This large, high-performance engine was designed to be BMW's next generation V8 and was placed in certain BMW 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from the 2009 through 2014 model years.

137.   Upon information and belief, the N63 engine was included on the V8 versions of the following BMW vehicles:

> F01 and F02 (7 Series Sedan) – produced from 3/2009 to 6/2012
> F04 (Active Hybrid 7) – produced from 4/2010 to 6/2012
> F07 (Gran Turismo) – produced from 9/2009 to 6/2012
> F10 (5 Series Sedan) – produced from 3/2010 to 7/2013
> F12 (6 Series Convertible) – produced from 3/2011 to 7/2012
> F13 (6 Series Coupe) – produced from 7/2011 to 7/2012
> E70 (X5) – produced from 3/2010 to 6/2013
> E71 (X6) – produced from 7/2008 to 6/2014
> E72 (ActiveHybrid X6) – produced from 9/2009 to 9/2011

138.   The subject vehicles are all equipped with the N63 engine.

139.     The N63 has become widely known and described as defective throughout the automotive industry and the BMW-enthusiast community.  It is widely recognized that N63 engines consume excessive amounts of engine oil and require frequent engine repairs, especially as compared to other, similar vehicles not containing N63 engines.

140.     Some owners and enthusiasts blame the oil consumption on BMW's decision to place the N63's twin-turbochargers between the cylinder heads, and inside of the engine V, rather than outside of the engine V, away from sensitive components, where turbochargers are typically located.

141.     N63 vehicles are notorious for consuming excessive amounts of engine oil and frequently need additional engine oil between scheduled oil changes to prevent catastrophic engine damage or failure.

142.     The oil consumption defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption.  Consumer Reports studied 498,900 vehicles across several makes and models for complaints about engine oil consumption and concluded that BMW's N63 engine was included on four out of the five most defective vehicles. (*See* http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm) (last visited March 6, 2019).

143.     The V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43 percent of vehicles needing an additional quart of oil between oil changes as of 2015. BMW's 6 Series and 7 Series, many of which contained the N63 engine, are the next worst performers. Finally, the V8 version of the X5 was the fifth worst performer in the study.

144. The Consumer Reports study also shows that a greater percentage of defective models start to consume oil as they age. This means that large numbers of N63 owners will begin to experience the oil consumption defect in the near future if they have not already.

145. Many purchasers of vehicles containing the N63 engine have become upset about the excessive engine oil consumption – which was not disclosed by BMW in the product literature – and have posted internet complaints about specific frustrations and hassles caused by the oil consumption defect.

146. For example, one N63 purchaser started a thread entitled, "Excessive oil consumption" on a BMW enthusiast website in November 2011:

> So I'm starting to get a little irritated at how much oil my 550 is burning. In the last 6k I've had to add 1 quart of oil three times. In other words it is burning a quart every 2000 miles. I've read about some people posting about having to add oil before but this much?? I've never owned a new car that burned any oil much less at this rate. Anyone else having this issue? Oh btw the car has 9120 miles and I put 3100 in Europe during my ED. When I was to have redelivery I had the dealer do an oil change and was gonna change the oil every 7.5k.

(*See* http://www.bimmerfest.com/forums/showthread.php?t=581072) (last visited Feb. 20, 2019).

147. A fellow BMW enthusiast responded with four separate links about the oil consumption issue and explained that the defect "was a hot topic back in September" 2011. (*Id.*)

148. An Internet search of "N63 AND Burning Oil" reveals thousands of similar complaints regarding the oil consumption defect.[1]

---

[1] *See, e.g.*, http://www.bimmerfest.com/forums/showthread.php?t=581072 (last visited Mar. 6, 2019); http://www.e90post.com/forums/showthread.php?t=874786 (last visited Mar. 6, 2019).

149.    BMW had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs since the defect poses an unreasonable safety hazard, and because BMW had exclusive knowledge or access to material facts about N63 vehicles and engines, not known or reasonably discoverable by consumers. Defendant, however, failed to disclose the defect to consumers prior to or at the time of purchase or lease.

150.    The oil consumption defect has become so problematic that BMW has issued several technical service bulletins ("TSBs") to address complaints of excessive oil consumption and other problems related to the N63 engine.[2]

151.    With regard to the oil consumption issue, BMW issued the following TSBs:

NHTSA ID Number: 10046859

Service Bulletin Number: SIB-11-08-12
Summary: DUE TO DAMAGED SEAL RING, DURING
ASSEMBLY, ENGINE OIL IS LEAKING FROM ENGINE OIL
PUMP VOLUME CONTROL VALVE GASKET SEAL RING.
MODELS E70, E71, F01, F02, F04, F07, F10, F12, F13. NO MODEL
YEARS LISTED.

_____

NHTSA ID Number: 10045282
Service Bulletin Number: SIB-11-07-12
Summary: BMW: WHILE DRIVING VEHICLE, AT TIMES
WOULD BE ROUGH RUNNING; WHITE OR BLUE SMOKE
SEEN EXITING EXHAUST SYSTEM AND THE ENGINE OIL IS
CONSUMED ABOVE SPECIFICATIONS.

152.    In June 2013, BMW issued SIB-11-01-13, which took the extraordinary step of changing engine oil consumption specifications for N63 vehicles, and specifically instructed service technicians to add two quarts of engine oil to N63 vehicles when the vehicles instruct owners to add only one additional quart of oil. (*See*

_____

[2] TSBs are recommended repairs issued by automotive manufacturers and directed only to automotive dealers. TSBs are frequently issued when a manufacturer receives widespread reports of a particular problem with its vehicles.

http://www.xbimmers.com/forums/showthread.php?p=14449679) (last visited March 6, 2019).

153.    Instead of addressing the underlying cause of excessive oil consumption in order to attempt to fix the defect, BMW recommended that its service technicians simply add more engine oil to respond to consumer complaints. Technicians were instructed to add two quarts of engine oil when the vehicles' electronic system specifically called for one additional quart and to also add an additional quart as the default fill on N63 vehicles. While BMW did not address the underlying problem, it likely reduced the number of complaints because the engine oil level in the subject vehicles would now be overfilled, a condition that can cause the engine oil to become aeriated, resulting in potential oil starvation and reduced oil pressure.

154.    Technical Service Bulletin SIB-11-03-13 appears to be part of a campaign to conceal the oil consumption defect and represent it as a normal feature of BMW vehicles. To this effect, BMW issued SIB-11-03-13, which upon information and belief includes the following:

> Service Bulletin Number: SIB-11-03-13
>
> Summary: All engines normally consume a certain amount of engine oil. This is necessary in order to properly lubricate the cylinder walls, pistons, piston rings, valves and turbocharger(s), if equipped. In addition, engines with less than 6,000 miles will generally consume additional engine oil because the internal engine components are not fully seated (break-in). Therefore, engine oil consumption complaints received prior to 6,000 miles cannot be considered.
>
> Once a new or remanufactured engine has accumulated 6,000 miles, oil consumption can be considered if there is a drastic change in the engine oil consumption rate (e.g., the engine oil consumption rate triples) under similar driving conditions.
>
> Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged). The additional oil that is consumed in a turbocharged engine is mainly due to the

turbocharger lubrication requirements. Some of the engine oil normally migrates past the turbocharger turbine bearing seals and will enter the intake tract of the engine.

All turbocharged engines also require a complex crankcase ventilation system. The crankcase ventilation system needs to maintain a small vacuum on the crankcase and not allow the crankcase to be pressurized. Pressurizing the engine crankcase can lead to external engine oil leaks and increased engine oil consumption via the piston rings and valve seals. When the load and the boost level of a turbocharged engine is varied, the path of the crankcase pressure is changed. During the crankcase ventilation path transition, a small amount of engine oil will pass through the crankcase ventilation system and is additionally consumed. The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.

Oil Consumption specification:
- All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.
- Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.
Turbocharged Engines:
Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines). In this case, a turbocharged engine could require topping of engine oil more frequently. For vehicles with N63 and N63T engines, refer to SIB-11-03-13 for additional details.

155.    BMW included every conceivable driving situation within this Service Bulletin as a factor for engine oil consumption so as to minimize its own responsibility and/or deflect blame onto consumers for the oil consumption defect. As can be seen from the TSBs, Defendant continued to misrepresent to its customers that the rate of oil consumption in the N63 engines was normal and to be expected in engines that are fitted with turbochargers.

156.    BMW made these representations notwithstanding that the stated recommended oil service interval at the time of sale of the subject vehicles was the earlier of 15,000 miles or two years. Of course, at the rate of engine oil consumption referred to in BMW's service bulletin, the N63 vehicles would consume nearly 20 quarts of engine oil

between the recommended 15,000-mile oil service intervals. Clearly, there is nothing normal or expected about this rate of oil consumption.

157.    Many N63 purchasers and automobile consumer advocates disagree that this level of engine oil consumption is normal and instead believe that it is excessive and well beyond normal.

158.    Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not.* (*See* http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm) (last visited March 6, 2019).

159.    Following hundreds of customer complaints about the oil consumption defect and other problems with N63 vehicles, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014 (herein, "Customer Care Package"). The Customer Care Package consisted of several different measures, which merely mask, but do not correct, the serious design and/or manufacturing defects of the N63 engine including the oil consumption defect.

160.    The Customer Care Package instructed service representatives to check each covered vehicle's timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary. BMW instructed its service representatives to inspect and replace these components for free, even if no longer covered by the manufacturer's standard four-year/50,000 mile warranty.

161.    Also, BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile

service interval. The Customer Care Package significantly reduced the mileage of its recommended engine oil change intervals for the subject vehicles. As a result, BMW reduced the oil change intervals from the earlier of 15,000/two years to the earlier of 10,000 miles or one year.

162.    BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

163.    BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

164.    Engine oil is important because it functions as an essential lubricant for the moving parts in internal combustion engines. The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear. Engine oil also has important cleaning and sealing functions, and serves as an important medium for dissipating heat throughout the engine. As a result, the subject vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

165.    As suggested by the N63 Customer Care Package, upon information and belief, the oil consumption defect impacts several components of N63 vehicles, either via combustion of excessive amounts of engine oil directly or by causing these components a lack of appropriate lubrication, which results in these components to prematurely fail and need frequent replacement.

166.    The oil consumption defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that

cannot be reasonably anticipated or predicted.  Therefore, this oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicles are in operation at any time and under any driving conditions or speeds, thereby exposing the Plaintiffs, their passengers, and others who share the road with them to serious risk of accidents and injury.

167.    Plaintiffs are informed and believe, and based thereon allege that BMW acquired its knowledge of the oil consumption defect in 2008, if not before, through sources not available to Plaintiffs, including but not limited to pre-release testing data, durability testing, early consumer complaints about the oil consumption defect to Defendant and its dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, as well as, from other internal sources.

168.    Defendant had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs to Plaintiffs because the defect poses an unreasonable safety hazard, and because Defendant had exclusive knowledge or access to material facts about the subject vehicles that were not known or reasonably discoverable by the Plaintiffs. Defendant, however, failed to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

169.    An engine that is starved of oil can seize up and cause the vehicle to shut down when driven, thus creating for each Plaintiff an unreasonably dangerous circumstance that may result in a crash.

170.    The oil consumption defect can be and has been enormously consequential to Plaintiffs, burdening them with out-of-pocket expenses that would not be necessary but for

27

such defect and depriving them of their original bargains.  First, excessive engine oil consumption requires additional service visits and increased maintenance costs due to the recently decreased oil change intervals, which the Plaintiffs specifically sought to avoid by purchasing high-end BMW vehicles. Second, the oil consumption defect means that Plaintiffs must be concerned with obtaining BMW-approved engine oil when needed.  If Plaintiffs continue to drive without adding oil, their vehicles might catastrophically fail and strand them or potentially cause a life-threatening accident.  This discourages Plaintiffs from traveling long distances in their N63 vehicles or forces them to carry an extra supply of oil.  Third, Plaintiffs will suffer significant loss when they sell the subject vehicles because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the oil consumption defect.

171.    Plaintiffs each provided Defendant or one or more of its authorized dealers with an opportunity to repair the problems with the subject vehicles. Defendant has neglected, failed, refused or otherwise been unable to repair the substantial impairments to the subject vehicles within a reasonable amount of time or a reasonable number of attempts.

172.    The oil consumption defect experienced by the Plaintiffs substantially impairs the use, value and safety of the subject vehicles to the Plaintiffs.

173.    The Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' acceptance of the vehicles.

174.    The Plaintiffs would not have purchased the subject vehicles had they known, prior to the respective times of purchase, that they would be required to regularly purchase and add large volumes of engine oil to the subject vehicles in order to prevent the subject vehicles' engines from failing.

28

## TOLLING OF STATUTE OF LIMITATIONS

**I.     Fraudulent Concealment Tolling**

175.    Plaintiffs did not and could not have known that there was an oil consumption defect with the subject vehicles' respective engines at the time that they purchased the subject vehicles or any time thereafter.

176.    The breach of warranties four-year statute of limitations, which might otherwise apply to bar some of the Plaintiffs' claims, should be tolled because of Defendant's knowing and active concealment of the fact that the subject vehicles' engines contain a defect.

177.    Defendant had a duty to disclose the oil consumption defect in the Plaintiffs' vehicles and had a duty to warn the Plaintiffs, who will foreseeably drive their vehicles, of those dangers, as an engine that is starved of oil can seize up and cause the vehicle to shut down when driven, thus creating for each Plaintiff an unreasonably dangerous circumstance that may result in a crash.

178.    While Defendant issued TSB's making clear it was aware that there was a defect with the subject vehicles' engines, Defendant failed to disclose the existence of the defect to Plaintiffs at the time of the subject vehicles sale and at the time Plaintiffs presented their vehicles to Defendant's authorized dealer for repairs.

179.    Moreover, Defendant's authorized dealerships informed all of the Plaintiffs that the subject vehicles' excessive consumption of engine oil was normal, rather than the result of a defect.

180.    Defendant kept Plaintiffs ignorant of vital information essential to the pursuit of their claims.

181.    Defendant knowingly, affirmatively, and actively concealed the subject vehicles' defect from the Plaintiffs.

182.    Defendant was aware of the defect with the subject vehicles.

183.    Based upon the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## II.    Discovery Rule Tolling

184.    Plaintiffs could not have discovered through the exercise of reasonable diligence that their vehicles contained the oil consumption defect within the time period of any applicable statutes of limitation.

185.    Plaintiffs did not know the engines in their respective vehicles were defective when they purchased their vehicles.  Plaintiffs did not and could not have known that the SIB-11-01-13 and the N63 Customer Care Package campaigns did not cure the oil consumption defect and left the subject vehicles engines vulnerable to catastrophic failure in the course of their normal operation.

186.    Although Defendant launched the SIB-11-01-13 and the N63 Customer Care Package campaigns for the subject vehicles, the campaigns were limited in scope, and consumers were not informed that that the campaigns would not cure the oil consumption defect and remove the risk of the subject vehicles engines vulnerable to catastrophic failure in the course of their normal operation.

## III.    Estoppel

187.    Defendant was under a continuous duty to disclose to the Plaintiffs the true character, quality, and nature of the subject vehicles.

188.    Defendant knowingly, affirmatively, and actively concealed the true nature, quality, and character of the subject vehicles from Plaintiffs, and Defendant never intended to repair the oil consumption defect in the subject vehicles.

189.     Based on the foregoing, Defendant is estopped from relying on any statutes of limitations in defense of this action.

## IV.     Class Action Tolling

190.     The statutes of limitation applicable to Plaintiffs' claims – including, without limitation, their breach of express warranty and implied warranty claims – have additionally been tolled by class action tolling in light of the *Bang v. BMW of North America, LLC* (Case No. 2:15-CV-6945) Complaint, filed September 18, 2015, and the Second Amended Complaint, filed in that case on March 21, 2016 (attached hereto as Exhibit A). *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350, 103 S. Ct. 2392, 2396 (1983) ("The filing of a class action tolls the statute of limitations 'as to all asserted members of the class'").

## FIRST CAUSE OF ACTION

### Breach of Warranty Pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*

191.     The Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

192.     The Plaintiffs are each a "consumer" as defined in 15 U.S.C. § 2301(3).

193.     Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

194.     The subject vehicles are each a "consumer product" as defined in 15 U.S.C. § 2301(6). 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

195.     15 U.S.C. § 2304(a)(1) requires Defendant, as a warrantor, to remedy any defect, malfunction or nonconformance of the subject vehicles within a reasonable time and without charge to the Plaintiffs.

196.     Despite repeated demands, Defendant has failed to remedy the subject vehicles' oil consumption defect within a reasonable time, and/or a reasonable number of attempts, thereby breaching the written and implied warranties applicable to the subject vehicles.

197.     As a result of Defendant's breaches of written and implied warranties, and Defendant's failure to remedy the same within a reasonable time and without charge to Plaintiffs, Plaintiffs have suffered damages.

## SECOND CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability Pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.* and Tex. Bus. & Com. Code § 2.314

198.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

199.     Defendant is a merchant with respect to motor vehicles.

200.     The subject vehicles were each subject to implied warranties of merchantability, as defined in 15 U.S.C.  § 2308 and Tex. Bus. & Com. Code § 2.314, running from the Defendant to the Plaintiffs.

201.     An implied warranty that the subject vehicles were merchantable arose by operation of law as part of the purchase of the subject vehicles.

202.     Defendant breached the implied warranty of merchantability in that the subject vehicles were not in merchantable condition when the Plaintiffs purchased them, or at any time thereafter, and the subject vehicles are unfit for the ordinary purposes for which such vehicles are used.

203.     Plaintiffs notified Defendant of the defects in the subject vehicles within a reasonable time after Plaintiffs discovered them.

204.     As a result of Defendant's breaches of the implied warranty of merchantability, Plaintiffs have suffered damages, including but not limited to incidental and consequential damages.

**THIRD CAUSE OF ACTION**
**Breach of Express Warranties**
**Tex. Bus. & Com. Code § 2.313**

205.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

206.     In connection with the sale of the subject vehicles to the Plaintiffs, Defendant provided the Plaintiffs with a New Vehicle Limited Warranty and Certified Pre-Owned Warranty, under which it agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the engine and its components.

207.     Plaintiffs relied on Defendant's warranties when they agreed to purchase or lease the subject vehicles and Defendant's warranties were part of the basis of the bargain.

208.     Plaintiffs submitted their vehicles for warranty repairs as referenced herein. Defendant failed to comply with the terms of the express written warranty provided to each Plaintiff, by failing and/or refusing to repair the oil consumption defect under the vehicles' warranty as described herein.

209.     Plaintiffs have given Defendant a reasonable number of opportunities to cure said defect, but Defendant has been unable to and/or has refused to do so within a reasonable time.

210.     As a result of said nonconformities, Plaintiffs cannot reasonably rely on the subject vehicles for the ordinary purpose of safe, comfortable, and efficient transportation.

211.    The Plaintiffs could not reasonably have discovered said nonconformities with the subject vehicles prior to Plaintiffs' acceptance of the subject vehicles.

212.    The Plaintiffs would not have purchased or leased the subject vehicles, or would have paid less for the subject vehicles, had they known, prior to their respective time of purchase or lease, that the subject vehicles contained the oil consumption defect.

213.    As a direct and proximate result of the willful failure of Defendant to comply with its obligations under the express warranties, Plaintiffs have suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of their vehicles, and a diminution in the value of the subject vehicles containing the defects identified herein.

**FOURTH CAUSE OF ACTION**
**Violation of the Texas Deceptive Practices Act**
**Tex. Bus. & Com. Code § 17.41, *et seq.***

214.    The Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully stated herein.

215.    The subject vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1) because they are tangible chattels that were purchased or leased for use.

216.    Defendant is a "person" under Tex. Bus. & Com. Code § 17.45(3) because it is a corporation.

217.    Plaintiffs are "consumers" under Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired the subject vehicles by purchase or lease.

218.    At all relevant times, Defendant has engaged in "trade" and "commerce" under Tex. Bus. & Com. Code § 17.45(6) by advertising, offering for sale, selling, leasing, and/or

distributing the subject vehicles in the United States, including Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

219.     The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, *et seq.*  As described above, Defendant misrepresented that the subject vehicles have characteristics, uses, and/or benefits that they do not have.  Furthermore, Defendant failed to disclose information concerning the subject vehicles that was known at the time of their sale, and such failure to disclose that information was intended to induce consumers into purchases they would not have entered had the information been disclosed.

220.     Specifically, and as alleged above, Defendant knew or should have known that the twin-turbo charged engine in Plaintiffs' vehicles had one or more defects that causes the subject vehicles to be unable to properly utilize the engine oil and, in fact, to improperly burn off and/or consume abnormally high amounts of oil. The oil consumption defect decreases the lubrication available to engine parts, which results in premature failure. As a consequence, the oil consumption defect requires unreasonably frequent oil changes and/or the addition of oil between scheduled oil changes.

221.     The oil consumption defect also is a significant safety concern in that it prevents the subject vehicles' engines from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted. Therefore, the oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicle is in operation at any time and under any driving conditions

or speeds, thereby exposing the subject vehicle's driver, passengers, and others who share the road with them, to serious risk of accidents and injury.

222.    Defendant acquired knowledge of the oil consumption defect prior to Plaintiffs acquiring the subject vehicles, through sources not available to consumers such as Plaintiffs, including but not limited to pre-production and post-production testing data, early consumer complaints about the engine defect made directly to Defendant and its network of dealers, aggregate warranty data compiled from Defendant's network of dealers, testing conducted by Defendant in response to these complaints, as well as warranty repair and parts replacement data received by Defendant from Defendant's network of dealers, amongst other sources of internal information.

223.    While Defendant knew about the oil consumption defect, and its safety risks since mid-2008, if not before, Defendant nevertheless concealed and failed to disclose the defective nature of the subject vehicles and their engines to Plaintiffs at the time of purchase and thereafter.

224.    By failing to disclose and concealing the defective nature of the N63 engine from Plaintiffs, Defendant violated the Connecticut Unfair Trade Practices Act as it represented that the subject vehicles and their engines had characteristics and benefits that they do not have, and represented that the subject vehicles and their engines were of a particular standard, quality, or grade when they were of another.

225.    The facts concealed or not disclosed by Defendant to Plaintiffs are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the subject vehicles.

226.    Plaintiffs relied to their detriment on those false, misleading, or deceptive acts or practices.

227.    Those "false, misleading, or deceptive acts or practices" were a producing cause of the economic damages sustained by Plaintiffs.

228.    Had Plaintiffs known that the subject vehicles and their engine were defective at the time of purchase, they would not have purchased the subject vehicles.

229.    Defendant's intentional concealment of and failure to disclose the oil consumption defect constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiffs, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiffs.

230.    Defendant is also liable under Tex. Bus. & Com. Code § 17.50(a) because Defendant's breach of the implied warranty of merchantability set forth above was a producing cause of economic damages sustained by Plaintiffs.

231.    Defendant's violations of the DTPA were made in connection with the purchase or lease of the subject vehicles by Plaintiffs.

232.    Plaintiffs relied on Defendant to disclose material information it knew, such as the defective nature of the vehicles equipped with the N63 engine, and not to induce them into transactions that they would not have entered had the Defendant disclosed this information.

233.    Plaintiffs have provided adequate notice to Defendant.

234.     Plaintiffs should be awarded three times the amount of their economic damages because Defendant intentionally concealed and failed to disclose the defective nature of the subject vehicles.

## DEMAND FOR RELIEF

WHEREFORE, the Plaintiffs demand judgment against Defendant as follows:

a.   An order approving revocation of acceptance of the subject vehicles;

b.   Money damages, in the form of a refund of the full contract prices, including, trade-in allowance, taxes, fees, insurance premiums, interest, and costs, and a refund of all payments made by Plaintiffs on the subject contracts;

c.   Equitable relief including, but not limited to, replacement of the subject vehicles with new vehicles, or repair of the defective subject vehicles with an extension of the express and implied warranties, and service contracts which are or were applicable to the subject vehicles, in the event that Plaintiffs are not found to be entitled to revocation;

d.   Incidental and consequential damages;

e.   Treble and punitive damages;

f.   Reasonable attorney's fees;

g.   Such other and further relief as this Court deems just and proper.

## TRIAL BY JURY DEMANDED ON ALL COUNTS

Dated: March 6, 2019

Respectfully submitted,

By:     /s/ Jody B. Burton
Jody B. Burton, Esq.
LEMBERG LAW, L.L.C.

43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile:  (203) 653-3424
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

THIS IS TO CERTIFY that on March 6, 2019, a true and correct copy of the foregoing First Amended Complaint was filed electronically with the U.S. District Court for the Southern District of Texas ECF system and that a copy of such filing was served upon the attorney of record for each other party using the Court's CM/ECF system.

By  */s/ Jody B. Burton*
Jody B. Burton